Our next case is 2016-2315, Exergen v. CAS. Mr. Shaw, please proceed. Thank you, Your Honor. May it please the Court, I'm Radeek Shaw for Appellate CAS of the USA. Unless the Court prefers otherwise, I'd like to focus first on the Section 101 patentability issues, both the substantive and the procedural aspects, as they have the broadest ramifications for the judgment below. Then I'd like to turn to the non-infringement of the 685 patent claims, which is one of the two patents in this case. As to Section 101, all 12 of the asserted claims, as a matter of law, fail the Supreme Court. To the extent there is doubt about that, the jury, and not the judge, however, should have resolved any factual questions underlying the Section 101 determination. What's your support for the notion that factual determinations under 101 have to go to a jury? Your Honor, this Court hasn't explicitly addressed it. On pages 43 to 44 of our brief... What kind of factual determinations are you talking about? It seems to me that ineligibility is just a question of law. Well, Your Honor, it's ultimately a question of law, but I'd draw the analogy to obviousness. It's ultimately a question of law, but it turns on, and it can turn on, and I don't think there's a dispute in this case, that it does turn on factual questions that go to, in particular, the step two of the Mayo Inquiry, whether the measuring steps here were something other than routine, conventional, and well-understood, and that was a debate about how the prior art devices, how the commercially available devices, how they worked, and how they were transferred to this context. And the other side calls those fact findings by the court, which it did after the trial. It's precisely those sort of fact findings, just like in the obviousness context, even though it's ultimately an obviousness, is a legal inquiry, the jury gets to decide those. And this court in Patlax said there's a Seventh Amendment right to a jury trial on invalidity defenses. Now, this court, as I said, hasn't specifically addressed Section 101 post-Mayo analysis to draw that line, but we think based on Patlax, based on the analogy to obviousness, based on this other court's decision... What's conventional and routine swept up in the legal ineligibility analysis and something for the courts to decide, for us to decide to know about? Your Honor, I think it is. Again, it's ultimately a legal inquiry, whether Section 101 is satisfied or not. But the question as to whether something is routine or conventional turns, can turn, and I think in this case is a good example of one where it does turn. And I think post-Mayo, lower courts are struggling with the dichotomy because there are real factual questions as to whether something is conventional, routine, whatnot. Just like in the obviousness context, there are questions as to whether a person of ordinary skill in the art might find a particular source to have made the invention novel or not, or provided a motivation to combine. And just like in the obviousness context, or with respect to any other invalidity defense, anticipation, obviousness, all of those are protected by the Seventh Amendment. The same should follow for Section 101. And the other side doesn't dispute that in its brief. Well, the other side emphasizes waiver, and I have to say that having looked at the various portions of the record that pertain to the issue of waiver, I'm hard-pressed to see why there isn't a waiver here. And particularly, starting with the joint pretrial memorandum, the statement that's made is the parties agree that the question of invalidity under 35 U.S.C. Section 101 is likewise a question of law to be decided by the court. To the extent the court elects to have the jury decide underlying factual issues, the parties submit proposed special interrogatories. But that sounds like what the parties are saying is, this is a question of law. If, Judge, you decide to submit these questions, in effect, to an advisory jury, here's what we would recommend you say. That sounds like a waiver to me. Your Honor, I understand that reading. I think what the parties were trying to get at, and at least what our client was trying to get at, was when it said, to the extent the court does that, the primary premise was, yes, you can decide this is a question of law. But, and I realize the phrasing isn't exactly, the phrasing leads to your question about it says elects to, look, I think what the parties were getting at, to the extent there are factual questions underlying 101, then here are the special proposed interrogatories that we want you to answer. Now, to the extent, I understand the competing reading, that they love this. The verb elect is the one that caught my eye. Yes. I agree with you, the word elects is tough there, but I think what they're getting at, when you look at everything in context, and I'm going to point to a few things that support my reading, that what they're trying to get at is, look, this is primarily a question of law, but court, to the extent there are underlying factual questions there, send this, give the proposed special interrogatories that we did, and I think the best piece of evidence- Look at page 16, 556, do you have your appendix with you? Yes. This is where the court, at the bottom of 16, 556, talks about, there's a question of fact, it's whether it was well understood routine or conventional questions, and he's heard Dr. Bowman's testimony and any evidence on that, and then he says, it's an issue for me in any event, so I think you're right, it's somewhat distracting to the jury to inject that issue into the case. This is the point in time where it seems to me, unless I'm mistaken, that the court has made a decision and informed the parties, orally, during the hearing, that it intends to not give those fact questions to the jury, am I right about that, is that where, is this where that occurred? Yes, your honor, this is where the court declines to send the special interrogatories- So where are your objections? Where did you request they go to the jury, and where are your objections to this court's statement during this hearing, that it was going to not send these issues to the jury? Sure, your honor, so the request to send it to the jury was in the special proposed interrogatories, so we proposed interrogatories and a jury question, now you're right that after that, the court said exactly what you read, and said, I'm not going to send this to the jury because it would confuse the jury. That was at the end of the day. The next morning, if you flip over to 15565, it's a couple pages later, in the appendix- 16565. 16565, yes. What CAS's trial counsel did here was it moved for judgment as a matter of law on the section 101 issue, and by moving for judgment as a matter of law, I'd submit, your honor, judgment of matter of law means, right, court, you can decide this as a matter of law, but to the extent you cannot decide this as a matter of law in our favor, it goes to the jury, and it's brought under Rule 50 of the Federal Rules of Civil Procedure, and here's what Rule 50B says, if the court does not grant judgment as a matter of law under Rule 50A, which is what is being brought at 16565, the court, and this is a quote, quote, the court is considered to have submitted the action to the jury. So by bringing the judgment of matter of law issue- You must be very good at the game of Twister. Keep going. So, your honor, by bringing the judgment as a matter of law motion, CAS was reemphasizing its right to have a jury decide that question. But then, if I can turn you to another page a little farther on, yeah, in 16672, you say in the Memorandum of Reasons in Support of Judgment of Invalidity that, and this is just before the legal standard section, after saying that the question of invalidity had been agreed upon as a question of law, you go down to the last sentence in that paragraph, as such, section 101 is an issue for the court to resolve now in the first instance as both the finder of fact and the arbiter of law. Again, it's very hard, let me put it this way, if I were a district judge and I had each of these pieces of advocacy before me, I would assume that you had waived your right to a jury, wouldn't I? Wouldn't I be reasonable in drawing that conclusion? I understand that, your honor. Let me give a couple pieces of explanation and context for this statement. So this was after the judge said, I'm not going to send it to the jury. We have the jury trial. CAS has made its JMAL motion that you should rule in our favor or send it to the jury. Jury verdict comes down. Now, afterward, the only way that CAS could prevail on section 101 is for the district court to do it. So it's in this context of this post-trial motion where the judge is now going to decide any legal and factual issues that CAS is making the observation that, look, for us to win, you are the decider at this point, so rule in our favor. What I would point you to show that CAS has not waived through that statement, the right to a jury trial, is after that, it filed a motion, a new trial motion, after the court actually adjudicated against it. And this is quoted on page 22 of our reply brief. It's in the district court docket. What the new trial motion says is that it basically says, because of the jury issues, and I'll just give you the exact language from the new trial motion itself, which again is quoted on page 22 of our reply brief, it says CAS was, quote, CAS was entitled to have the jury receive instructions and to make any section 101 related findings in the first instance. Right. That's after the case is over, perhaps when appellate counsel got involved, you decided this was an issue that you might have done well to have raised before the district court. But isn't that a little late? Well, Your Honor, I think if you add up the three pieces of evidence, the fact that we provide the special proposed interrogatories on the factual questions, two, we move for JMAL right before the jury retired to say, look, judge, either decide this as a matter of law or send it to the jury, and then three, after the court decided that it was going to do it and rendered its opinion, said, look, in your opinion, you relied, you didn't just decide this as a matter of law. You relied on the trial evidence. You made factual findings on that routine, well-understood theory. In light of that, right, if the trial court had just decided it after trial as a matter of law and there were no factual issues involved, then, Your Honor, I don't think our new trial, this new trial motion would have been appropriate because, as Judge Hu says, to the extent it's a pure issue of law, the court can decide that. But because in its post-trial order, it did resolve factual issues, we filed a new trial, has filed a new trial motion, and there it says, look, because you are, because you made section 101 jury question-like findings, we need a new trial because that, so that's the context in which I think this, this will arise. The party has, in their brief, explained, it seems to me, in what I would think of as a sort of traditional Seventh Amendment analysis, why there is a right to a jury trial for this issue because this feels a lot like, say, indefiniteness or claim construction where it's a question of law and where district courts can and do frequently make the fact findings that underlie those issues. In fact, as you know, claim construction can't even be given to a jury. And then there are other issues where you could ask the jury for an advisory verdict if the court chooses. Why do you assume that there is a Seventh Amendment right to a jury trial of this issue? Well, Your Honor, we think the best analogy based on Supreme Court precedent and based on this court's precedent to the section 101 finding is the obviousness inquiry. And this court has held categorically that that is subject, and the Supreme Court has held categorically that that is subject to the Seventh Amendment jury right. And like obviousness, again, that is ultimately a question of law, just like section 101, but it turns on underlying factual questions. And as this court said in Patlax, when you have patent invalidity defenses that arise in the course of a patent infringement trial, the defendant has a Seventh Amendment right to have those patent validity defenses litigated. And now, again, I submit, I absolutely acknowledge that Patlax did not specifically address section 101, but I can't think of any reason why to distinguish section 101 from those. And the other side doesn't offer any. Maybe because, I'm sorry, maybe, well, what about like indefiniteness? I mean, do you think indefiniteness has to go to a jury? It's often so completely and utterly intertwined with claim construction, and it has almost the identical sort of, quote, underlying fact issues that claim construction has. Would you be suggesting that you think indefiniteness has to go to a jury if someone asks for a jury trial on that issue? No, Your Honor, I wouldn't go that far, but I think I would distinguish that along the lines that you suggested. It's so wrapped up with claim construction, which is, as we know from Supreme Court, is in fact a judge question that I think indefiniteness is different. But I think section 101, based upon how, especially after Mayo and Alice, how the jurisprudence has evolved, much more like obviousness or anticipation or the other invalidity defenses that this court discussed in Patlax that do, that are protected by the Seventh Amendment jury trial. This hasn't come up much pre-Alice and Mayo. These are typically decided. One last question about this. I'm going to give you time to address infringement because I think that I know I have a couple questions on it. So don't worry about your time at the moment. On the Seventh Amendment question, though, you're making an analogy. You're saying there should be a Seventh Amendment right because this is like obviousness, where there's a Seventh Amendment right. You recognize that in indefiniteness and claim construction, there's clearly no Seventh Amendment right. And indefiniteness may very well fall the direction of claim construction. Is that really how we decide constitutional issues, which this is more like? I thought the Seventh Amendment required us to go back to 1787 and decide whether there was an analogous cause of action in English common law. I don't think that we sort of make it up by analogy, do we, when we're deciding this constitutional issue? My understanding of the Seventh Amendment jurisprudence isn't, I can decide which one is more like. Sure. So, Your Honor, it's a multi-factor test. One of that is the historical dimension. You go back. And so the question is the historical analog. We think the best historical analog, again, is something along the obviousness lines, right? Is this something, especially when you get to the step two type inquiry, have you gotten to something that's beyond conventional routine or well understood in applying it to the natural law concept? So, we think if you go back and look at the history of 1787, the closest type of proceeding like this would have triggered an action at law that's entitled to the Seventh Amendment, right? We don't have a perfect analogy because there wasn't the Section 101 at that time, but, and so that's why we reasoned by analogy using the history and then reasoned by analogy. Look, if this court has recognized Seventh Amendment protections for obviousness, anticipation, other invalidity defenses as it's set forth in Patlax, then what would be the reason to act differently, especially in a post-Alice Mayo world where you have these underlying factual questions that could inform the question? So that's our analysis. And what I would say is the other side hasn't disputed that there would have been a jury trial right here, but for the waiver. And so I think that's the posture that we're in now. Could I ask you about infringement? Sure. 685. Yes. Pat, you say that the accused devices are computing an internal body temperature. We say they are not computing an internal body temperature. I'm sorry. The claim requirement is- That's right. That's right. All right. And if I understand it, the way the devices work, the accused devices, is that they use a lookup table to get oral equivalent. Correct. All right. And the internal body temperature means the temperature under the skin directly below the point that's being detected. Is that right? Yes. The exact wording is the temperature beneath the sense surface. Right. And that is through, presumably, a lookup table. That is through the computation that they have claimed in their patent, the K factor coming up with- Right. Yes. Right. But presumably, the K factor is plugged into- Yes. It's plugged into a heat balance equation. Right. Okay. That's different than the oral equivalent. Right. Okay. All right. Yes, Your Honor. And on literal infringement, all of what you just said, Your Honor, is undisputed. There's unrebutted evidence that that's what the accused products here do. They have the lookup table. They take skin temperature. They have a lookup table that's geared to oral equivalent temperature directly. They then compute the oral equivalent temperature. They at no time attempt to compute that internal body temperature. And this is not, Your Honor, a doctrine of equivalence case or a case where you can say, oh, well, maybe they come to the same number that somewhere in the body between the skin and the heart, you'll get to that same temperature. Well, Judge Stern seemed to be of the view that if they came to the same number, that would be infringement. Right. You disagree. I disagree, Your Honor. I guess two responses. One is we don't think the claim construction gets you to the same number that just because it's an oral equivalent number that just because somewhere in the body below, between the skin and the heart gets you there. And I think exigent v. Walmart, I think, supports us on that where they tried that same argument that the oral equivalent temperature and internal temperature were one and the same and this court rejected it. But beyond that, even if you assumed that it coincidentally did match somewhere and that it fell within the claim construction still that the temperature did somewhere match, we don't think that would work. And the reason is this. One is because to be literal infringement actually has to be computing that temperature. Again, the lookup table computes the oral equivalent temperature. The second point I would make is, and the reason we only bring the non-infringement motion with respect to the 685 patent and not the 938 is critical. Because the 938 doesn't just say compute an internal body temperature. It says compute the body temperature approximation. If that was the language, and this is the reason we didn't bring the same argument with respect to that, well then maybe their argument to get around exigent v. Walmart would work. That, oh, well somewhere in the body between the skin and the heart you're going to come to that temperature. Maybe that's a body temperature approximation that's being calculated. But that language is not in the three 685 claims at issue. 685 claims say compute the internal body temperature. And so that's why without doctrine of equivalence, without the body temperature approximation language that's in the 938 patent claims that are not in the 685 patent claims, which more precisely require computing an internal body temperature, that's why we think the fact that it undisputedly calculates the oral temperature. OK, Mr. Schall, thank you very much. We'll restore two minutes of rebuttal time. Mr. Timbers. Thank you, Your Honor. May it please the court. We haven't talked about 101 step one at all today so far. At the time that this case was briefed and decided in March 2016, we didn't have the rapid litigation to talk about step one. So neither party actually said a whole lot about step one. But they did both talk about step one. The court didn't decide step one. The court sort of skipped step one and went straight to step two. The question here for both step one and step two is what problems were trying to be solved by the invention and what specific steps in this method were aimed at solving those problems. The specification identifies these problems, finding the temporal artery or an artery and cooling of the skin caused by the thermometer itself. The patent specifically ties these steps of scanning, and it's not just any scanning, it's scanning across the forehead, that's laterally across in some cases. Lateral was defined as generally horizontally, so it's not just any scan, but generally horizontally. And across the forehead was all the way across the forehead. So it's a very specific method. And this method is not required by any of the natural laws or natural phenomenon that relate to the temporal artery itself or heat balance equation. But you agree that the equation is a natural law. Yes, absolutely. If the patent is directed to the equation, you have to demonstrate that there's something more that's not routine and conventional, right? If it's directed at that, that's correct. But the question is for these particular claims, not claims that were brought to this court before, but these particular claims aimed at this particular limitation and these particular limitations of the method. In the other case... I have a really hard time distinguishing this case from Ariosa. I mean, you have a somewhat novel idea, a very novel idea, I think, that was pre-revolutionary, but we still found it unpatentable because all it did was make a discovery of the use of a natural law and then employ that natural law using conventional equipment and techniques. Isn't yours the same? I think the big difference is the generality with which Ariosa claims define steps, detecting, comparing. These basically covered any method of detecting and wasn't specific. Well, that's not quite true. I mean, in Ariosa, they note that there's a bunch of different ways that they were going to use these things, and some of them were pretty specific. They claim... I can't pronounce some of these words. It's a problem of science. But it claims amplification by polymer-based chain reaction via sequence-specific probes. I mean, it has more detail, but it was just different methods of detecting. Why isn't your device just using conventional methods of detecting? So, with respect to that, there's no evidence of conventionality of any of these methods. So, this running generally horizontally across the forehead, for example, never been done. That's not conventional. There's no evidence of conventionality, of well understood by those of ordinary skill... Your thermometer is conventional though. Pardon? Your thermometer itself is conventional. The actual device contains thermistors and electronics that, yes, have been used There's no evidence by anyone that this was routine or conventional. I think this is a key question. Wait, just let me ask this. So, the thermometer itself is conventional. The way it does its measurements is conventional. Its calculation relies on a natural law, which is not patentable. So, what is it you're saying makes it eligible under Step 2? And just assume I'm at Step 2. Is it running it across the forehead? It's running it across the forehead. It's the combination of the limitations, which are different in various different claims. But yes, in one of the claims, it's running it generally horizontally all the way across the forehead. And at the same time, getting the peak from multiple, more than three times per second. Well, isn't the peak and measuring multiple times per second conventional as well? Doesn't your prior art device do exactly that? There is a prior art device that, for a different purpose, for the purpose of finding injuries on the body and making differential determinations, not for body temperature, can have a mode where it scans. There's no evidence that was ever done at the forehead, or in that particular lateral direction, or all the way across the forehead. There's also no evidence that it was routinely used, that it was well understood by those of ordinary skill in the art, or that it was conventional. And the language in Mayo is very specific when it talks about well understood, routine, and conventional. Sure, but the language in Mayo is also specific about what it needs to do under Step 2. And it has to do significantly more than just conventional detection methods and employing a law of nature. And I find it very hard to think that running something across the forehead is substantially more. Well, if it's never been done, Your Honor, never been done. And never been done to solve these problems. But never been done is true in Ariosa. Never been done to detect fetal DNA in the mother's bloodstream. Never been done. But use conventional routine equipment because it discovered that DNA was circulating in the bloodstream. Never been done focused on the natural law of the phenomenon in Ariosa. And in this case, that would be specifically the temporal artery and in use with the heat balance equation. But in Mayo, the discussion of well understood, well understood doesn't just mean in the prior art. Conventional doesn't just mean it happened before. And routine doesn't just mean it happened a few times. The Supreme Court in Mayo always tied... Well, I understand why you want to argue Mayo, but we have to follow Ariosa too. And I don't understand how we can possibly affirm eligibility finding in this case when we didn't find almost seemingly identical types of claims ineligible in Ariosa.  Except based on the forehead, apparently. In step two in Ariosa, it was agreed upon that it was well understood, routine and conventional. There was no dispute about that at all. In this case, the district court found or determined that it wasn't routine, well understood or conventional. And that's because the evidence in this case did not show that. For example, Kaz's expert was not even asked that question. And when you ask the question of well understood, routine and conventional, you're asking it with respect to a specific audience, which is what Mayo says. Well understood by whom? Was there any evidence about how this was understood by those of ordinary skill in the art? Or people who took temperatures or people who built thermometers? No evidence. What about routine? Not at all. Dermatemp, these other things that were in the prior art, there's no evidence at all about how much they were used, how common they were. The language in Mayo makes clear that that actually matters. This is not just a question of whether a single limitation or two or three or four limitations are in the prior art. It's a question of what was seen to be, how this was seen by those of ordinary skill in the art. What is it, your view, that needs to be in order for something to be deemed not to satisfy in Step 2? What is it that needs to be routine or conventional? Take it with respect to the facts of this case. In this case it comes down to the, we're not going to look at the formula at all. So all we're looking at is what's more in Step 2. So in this case it's the scanning and the specific requirements. So it's not the thermometer. You're not resting on the fact that you have, the thermometer may very well be conventional. The claims just require a temperature detector, so there's nothing special about that. It's the technique that you're applying this conventional instrument to solve a problem that was not previously solved. It's a technique that's not conventional. Exactly right. And in that case this is like Thales or Thales, I'm not sure the right way to say it. Because in Thales they use completely conventional technology. But instead they had a different way of analyzing, basically relating the data. And this case is very, very similar to that. And it's also similar to Deere, which Thales also analogized to. In Deere you had a case where you're taking conventional technology and you are deciding that you're going to make continuous measurements of temperature throughout a process, right at a specific place. That's very similar to this case, because we're taking temperature measurements using nothing special, but we are using a specific method with specific steps to solve problems. And these problems are not problems that are required to be solved by the natural law and phenomena. Can I ask you about infringement of the 685? Yes. Why isn't it the case that the accused devices which compute the oral equivalent, using presumably a special lookup table, are doing something other than computing the internal body temperature, where internal body temperature has been construed to mean the temperature of the portion of the body between the skin above the temporal artery and the artery? They're not computing oral equivalent. They're computing an internal body temperature, and then reporting that out to the consumer as an oral equivalent. And the evidence that is ignored by CAS is that our expert tested all of these devices. And in testing the devices determined that they take a temperature here, across the forehead, it's cool because heat is being lost to the environment. In fact, it's being lost all the way up along the artery path from the heart through the temporal artery and the skin. And what it's reporting out is a higher temperature. Sure. Of something underneath. Being higher, it would seem to me, is it not just not enough? It has to be the higher temperature that is in fact the internal body temperature as defined by the claim. And that's exactly what it does. Because the heat flow path doesn't even go to the mouth. Everybody agreed upon that. Heat flow path goes up and the part that we care about is in the forehead. Right, but if they have a... Suppose that you've got a look-up table in a device that's an embodiment of your claim, which tells you what the temperature is below the skin. And they've got a look-up table that shows what they are looking for, which is oral equivalent. And if those two look-up tables are different, why is there infringement? Well, there's no evidence of two look-up tables or them being different. And the evidence that we're relying upon is not the look-up table evidence. The evidence we're relying upon is the fact that a higher temperature is reported. Now that has to be a higher temperature below the surface. It has to be. So as long as the temperature that is being reported is higher than the skin temperature, they infringe, period, regardless of whether it is something that is designed to reflect the temperature of some other part of the body entirely? They're saying it's designed to reflect oral equivalent, but the oral equivalent temperature is going to be the same as something that is beneath. And what is beneath... Well, why is that? That's the key question. Why is that true? Because of the physics of heat flow. And there was a lot of testimony at trial about this, and it was agreed upon by both experts. The heat flow flows up in a specific path, not all over the body in this case, but a specific path up through the arteries, into the temporal artery, and then out through the skin into the environment. This is a very specific heat flow path. We're not talking about the heat flow path to the hands or to the mouth. In fact, the blood flow does not go along that path to the mouth. And both experts agreed upon this. So if we are reporting a higher temperature, it must be along that heat flow path. And other claims in the 938 talk about the heat flow method. They don't talk about internal body temperature. But it's all related. The science of it, the natural phenomenon, if you will, is that the heat flows up through the temporal artery and out. I see my time is over. Thank you very much. Mr. Shaw will restore two minutes of rebuttal time. Can you start with the infringement issue, please? On infringement, this is the first time I've heard, not in the trial record, not in their appeal briefs, that the lookup table might be the same. They are undisputedly different. They have different variables, oral equivalent versus core or internal body temperature. Undisputed, unrefuted testimony that the accused devices use an oral equivalent lookup table while their devices use the heat balance equation that's claimed in their patents. Of course, the question isn't what their devices use. What their patent claims is that arterial heat balance equation. They have their own k-factor. The key discovery that Dr. Pompei made was finding the k-factor. That's not what the lookup table that these accused devices use. So they are not, in fact, computing as a literal infringement matter. They are not computing that internal equivalent temperature. For that reason alone, it should be non-infringement as a matter of law. They are only computing the oral equivalent and not the internal body, which is what their claim requires. Their 685 claim as opposed to their 938. If there are no more questions on literal infringement, I'd like to turn to the substance of Section 101. Because if you rule for us on the substance, you don't need to reach the more complicated and open-ended 7th Amendment issue. Judge Hughes, we think you have it exactly right. Ariosa is the key case. As I understand counsel's argument, the main distinction is the techniques being used here have never been done on the forehead or over the temporal artery. But that was true in Ariosa. I get Ariosa, but how do you distinguish fails, which seems to be your friend's strongest support? Sure. I think fails is very different, Your Honor. That was coming up with an entirely new technique using arrangements of sensors in a new way that had never been done before to do measurements, to compute measurements that had never been taken before. Here, skin temperature measurements have been taken since the dawn of time. And in particular, their own accused devices have taken precisely the skin measurements they've taken using peak detection thermometer. And this is disclosed based on their own specification. I don't have to go beyond their specification. It does peak temperature. It does multiple readings per second. That's both the Dermatemp and their ear thermometer. And their ear thermometer, Your Honor, works exactly like this. The guts of the two thermometers are exactly the same. The difference is the ear thermometer is taking a temperature in the ear. So you scan inside the ear. You move it back and forth inside the ear to get the hottest spot of the tympanic membrane. That's what their ear thermometer does. It's disclosed in the specification. Undisputed evidence on that. You have argued that you're entitled to a jury trial on the fact question. So I assume that this very thing you're talking about, namely whether something was conventional or routine in the art, is the fact question. And so is it your view that I have to review that fact question for clear error deference? No, Your Honor. We think that our arguments here are based on the specification and all of that. So it can be decided as a matter of law. Your brief expressly says whether something is routine and well understood and conventional is a question of fact. Well, Your Honor, what our brief says is often that question can be decided and we move for judgment as a matter of law on that issue. If the evidence can only be read in one way, then even if it's a question of fact, just like courts decide summary judgment on Section 101 issues, if there's no evidence that could support... So assuming there is no evidence on the other side, like assuming, for example, that I agree that there is evidence that's disclosed in one piece of prior art that isn't even taking temperature. Suppose that I assume that there is some evidence on the other side. So now, what is the standard of review that I use to adjudicate on appeal this question? Well, I still think, Your Honor, that you can decide this without deferring to the factual findings because there were no factual findings as opposed to the elements that you need, the specification and how the devices work. That's all undisputed. So whether you want to apply clear error or another standard of review, I think you come out the same. Now, this then falls back into our jury question. The reason we think, if you disagree with me and think that this turns on disputed questions of fact, then I think it does fall back into the jury question. You can't just rely on clear error because a jury should have resolved those factual disputes. But the key point I would make on the question about the ear thermometer and whether it's conventional or not, it's working in the exact same way. You take the temperature in the ear to find the hottest spot, the peak temperature, the tympanic membrane. Here, you're trying to find the hottest spot on the forehead over the temporal order. Your time is up. Thank both counsel for their arguments. The case is taken under submission.